case numbers 24, 57, 65, the United States of America versus Octavius Ferguson, 24, 58, 33, United States of America versus Jordan Powell, and 25, 50, 53, the United States of America versus Markel Young. Oral argument not to exceed 30 minutes per side. Ms. Basha, you may proceed for the first appellant. Good morning. May it please the court. Rhea Basha on behalf of Appellant Jordan Powell from the Federal Community Defender Office, and I'd like to reserve two minutes for rebuttal. Very well. I'm going to spend most of my time on the Batson issue, so if the court wants to move me along at all, please do let me know. That's fine. Batson tells us that even one race-based strike is too many. And here there was one strike set against a pattern of government action at trial that should cause this court constitutional concern. The government disproportionately struck black members of the veneer from an already homogenous jury pool. The district court was wrong then. The fact that it's a homogenous jury pool, that has nothing to do, that's not the government's fault, right? We don't blame the government for that, do we? No, it's not. But it is a fact that this court, when looking backwards at the conditions that these strikes were occurring against, it is a fact that this court should consider that each strike of a black member of the veneer weighed all the more against. Well, we should consider that you're saying the government should have considered it. The government should have. Were they legally required to? Whether they were legally required. There's only one black person in the entire jury pool. That raises the stakes of if the jury pool is 95% black, will they strike one? Or it could be the reverse racial. I just don't know. Is that legal? I'm just curious. Is that legally relevant? What it does is that it should put the district court on notice that the stakes are that much higher as to that one member. Is that illegal? Is that illegal? That's a legal aspect of that? It does go to whether the government's rationale. It wouldn't matter whether there's 100 or 0 or 1 or 5. You can't strike people on the basis of race. I believe it is a legal factor that should go into whether that strike was race-based or not because the stakes are that much higher. Here, out of a veneer of 73 people, there were 11 members of the veneer that were black. And then of the five members of the veneer that were black people who were not stricken for cause, the government struck four. And those are the kinds of stark numbers that the Supreme Court tells us should matter. In addition to that pattern, then, there are other tools that this court can use when looking at the record, like a comparative analysis of juror number 307, who was a black woman that we posit was stricken for her race. When using comparative analysis... Is 307 the only juror that you're challenging in this appeal? That's correct. Okay, so the others that were struck that were black, you're not challenging? That's correct. There were two black veneer members who were stricken. The defense did not raise abats and challenges to those. By the time they got to juror number 307... But those were perfectly fine. Those were perfectly fine, right? No objection to those. Well, the question here is whether the defense had picked up on this pattern, right? So by juror number 307, they realized, oh, this is the fourth peremptory strike that the government had used on a black person. And so that put them on to then raising the abats and challenge. Then there is a juror after that, juror number 275, who is another black woman, where the district court substantiated the abats and challenge. So when comparing, then, juror number 307, who was this conscientious, which is how the district court describes her, someone who was really weighing her role on the jury, comparing her in-court colloquy with the district court, as to a juror like juror number 204, who similarly exhibited really an unequivocal bias towards the government, towards the ETF, towards the FBI. Well, he seems to be biased against everyone. That's correct. So maybe he's, in that sense, he's even-handed. I think he calls himself an equal opportunity, but he does point, the record shows, to the members, to the parties in the room, as well as the judge himself, and says, I don't trust you, I don't trust you, and I don't trust you. And then the court works to rehabilitate him and eventually finds that he has been, just as the court had done with juror number 307. But here, where that comparison comes into play is that the government credited the in-court rehabilitation as to juror number 204 and not as to juror number 307. And the district court should have picked up on that discrepancy to realize that the government's rationale as to 307 was implausible. And another tool that this court can use from the record is the district court's finding itself that the government had acted with some kind of discrimination as to juror number 275. And those strikes by the government occur almost contemporaneously. So it's not like the intent on the part of the government suddenly disappears as to 307. That is another factor that the court could have used in weighing whether the strike was pretextual. And then lastly, I think Judge Riegler was kind of getting to this, there are the overall stakes of race in this case. We have three young black men who are on trial, and with an already homogenous jury pool, each strike that the government made weighed much more heavily against the fairness. So I take it the numbers were all wide except for one black juror? It was only one black juror that made it onto the jury, that's correct. Do we know the ethnicity of any of the other jurors? That's not clear from the record, but based on, there's a point where the defense lists the black members of the jury, of the veneer rather, that had been struck. It's clear that aside from that one juror, 275, the rest were not black. I want to remind the court just how global this inquiry is. At the third step of Batson, we have from this court in the United States versus Torres Ramos, that we have to consider all circumstances that bear on this issue of racial animosity. Now, the government tries to debunk this comparison to Flowers versus Mississippi, where there certainly the numbers were stark, and the court was dealing with a prolonged history. But we want to remind this court that Flowers doesn't set a floor. It just reminds us that when the stakes are this high, a reviewing court can look backwards as to what happened. Ms. Basha, let me ask you. The district court, I think we all agree, did the right thing at the first stage, and it found that there was a prima facie showing. And that was primarily based on the numbers. You've talked a lot about the numbers. But then at step three, I guess what I'm trying to tease out is what is it specifically that you think that the district court got wrong when it probed a little bit further to determine whether or not it thought that it was pretextual? What is the thing that we can look to to say this fact is the thing that should have given the court really notice and it should have made a determination that the government's explanation was a pretext for discriminating? Sure. And if I may just use the remainder of my time to finish the question. Sure. I think that's where the comparative analysis is very helpful, because that third step of Batson is asking whether or not the government's explanation was pretextual. And here the government really leaned on juror number 307's written questionnaire in a way that they didn't do with juror number 204, who was also someone that created this concern of bias against the government. And the way the government credited his in-court rehabilitation as opposed to juror number 307's in-court colloquy, where she's really going back and forth with the court at length about whether she can serve as a fair and impartial member of the jury, the court should have put those side by side, even if it wasn't doing its own comparison, looked to the government's overlooking and ignorance of that in-court rehabilitation to realize that their explanation didn't really make that much sense. It was implausible. Okay. Thank you very much. Thank you.  May it please the court, good morning. Casey Berente on behalf of the appellant. Mr. Ferguson, I'd like to reserve two minutes for rebuttal. Very well. With my limited time this morning, I'd like to focus on the first issue presented in Mr. Ferguson's brief, and that is the lack of sufficient evidence showing that this case was properly brought in federal court. A necessary element of the Vicar offense is that the government must show that an enterprise or the Hoover Street gang's activities affected interstate or foreign commerce. Looking to what the government points to in their briefing, it is this testimony from cooperating witnesses, Mr. Ballard and Mr. Ross. But these cooperating witnesses are non-members of the gang, and they both admit that they participated in drug dealing with Mr. Young and Mr. Ferguson, respectively. Mr. Ballard admits that he drove Mr. Ferguson around, protected him while he was drug dealing. And Mr. Young, sorry, Mr. Ross testified that as to Mr. Young, he also drove him around and protected him while he engaged in drug trafficking. These are individual instances of drug trafficking with non-members of the gang. This joint activity cannot be computed to the rest of the gang or considered gang conduct. So there's not only this testimony that these individuals are doing separate drug dealing with non-members of the gang, but we also have testimony that they're not even selling the same marijuana, that Mr. Young is selling a higher grade of marijuana and Mr. Ferguson is selling this lower grade. We also have testimony from Mr. Ross that shows us that Mr. Young was engaged in drug trafficking years prior to any alleged formation of the Hoover Street Gang and that he was engaged in trafficking all sorts of different controlled substances. So is your theory that if a gang member, if part of the gang activities are distributing illegal drugs, that the gang members who are engaged in that activity can only engage in it with other gang members? I guess I'm just not kind of following that. Your Honor, I... And if so, what is there in the record to suggest that there is that restriction or limitation on this purported enterprise? I would point to this Court's decisions in Wachosh v. United States and United States v. Ledbetter that tells us that this lone wolf type of activity cannot be computed or associated with the gang membership just because these individuals happen to be gang members and they happen to be participating in criminal activity doesn't mean that their mere status within the gang now increases their criminal activity to a racketeering offense. There is no relation in this evidence from the government that shows this drug trafficking was done at the behest of the organization, that there's no coordination between any of these individual members in their drug trafficking. We don't have any pooling of profits. And we can look at this Court's decision in United States v. Gills where we have former members of the gang who talked about, you know, an animating purpose of their membership in the gang was drug trafficking and it was to facilitate individual members in their drug trafficking and what they would do is they would pool profits together to buy drugs and then protect one another and establish a specific territory to then sell drugs from. There's just no type of evidence here where we see any coordinated activity that these individual members' participation in drug trafficking is benefiting the gang. In fact, we have Mr. Ballard who tells us that Mr. Ferguson's profits are spent on clothes and shoes. That is not going back to any benefit of the gang. We also can point to Mr. Ross' testimony where he talks about establishing some kind of pot that the gang members engage in. When we look at the testimony on day nine of the trial and is on page ID 4391, we see that this pot is related to robberies. It's not related back to any drug trafficking. So again, we're lacking any kind of coordination that shows us that these individual members who are participating with non-members in their drug trafficking can be related back to the enterprise because we're regulating enterprise, not people, right? And with my limited time left, I'd like to switch over to the animating purpose of maintaining or increasing the position in the gang. We also have a lack of evidence showing that this shooting was done for the purpose or general purpose of maintaining or increasing position in the gang. We, again, have non-members testifying who state that they don't have the personal knowledge of the inner workings of the Hoover Street gang, that their knowledge is coming from their observations of being around members of the gang. And we have Mr. Ross' general testimony that says, yeah, as a part of the Hoover Street gang, I know that they have to put in work in order to stay within the gang. But this was never related back to the shooting of Mr. Vinson. And we just don't have any evidence here that shows that, you know, Mr. Ferguson was committing a bunch of different crimes before the shooting, and there's no evidence that he was ever promoted prior to this or that he was demoted for not participating in any kind of gang-related activity. The mere fact that there's some testimony about a promotion to being a baby gangster or a BG. Correct, Your Honor. It was the shooting of Mr. Vinson, he was promoted to a baby gangster. But why isn't that enough to allow a finding that this was done for an enhancement within the gang? Your Honor, I believe that Teeter's on a retroactive animating purpose at that point. Just because this individual was later promoted does not show that he participated in the shooting because he was expected to or that he was told that he would be promoted or demoted for not participating within the shooting of Mr. Vinson. I ask that this court, with my limited time left, find that the government's evidence did not establish the necessary vicar elements to show that even though this was a violent crime, it should have been state and state court and not federal court without this interstate commerce nexus or without any maintaining or establishing the purpose element for the murder of Mr. Vinson. Thank you. Thank you. Good morning. Good morning. May it please the court opposing counsel, my name is Jeffrey Nunnery. I'm here on behalf of Markel Young. I would like to reserve three minutes of my time for rebuttal. Very well. In my limited time here this morning, I would like to focus my argument on our first argument, submit the second argument with respect to sentencing on the briefs. The issue in this case is whether or not the trial court should have granted Mr. Young's post-trial motion for judgment of acquittal under Criminal Rule 29. The standard of review for this court to employ is de novo. It's our position that the jury's verdict, now Mr. Young was charged similarly as the other defendants with the four counts, but he was found guilty of only one, and that was count three, brandishing, use, employment of a firearm during or in relation to a crime of violence. So count two is focused really on the fact that there's a murder. Correct. And count three is focused on the fact that a firearm is used in relation to a violent crime. Correct. So why couldn't your client envision or have been part of a plot to know that a firearm would be used, but that he didn't commission a murder necessarily? Maybe he thought they were going to go just shoot up the house not knowing whether the victim was there, they're going to shoot guns around the house. That seems not totally implausible. No, but the issue arises with respect to the fact that the jury was instructed that in order to find Mr. Young guilty on count three, it must first find that he committed the act alleged in count two on which he was acquitted. So the way that the jury was instructed is that the elements of count two, the acquitted count, were subsumed into the first element of count three. So right there we have a negative finding. And so that should have been where the jury's inquiry ended. You don't pass go, you don't collect $200 and send Mr. Young straight to jail. Once you fail on the first element of count three, I don't think that the jury had any business considering the remaining elements. And that's what makes this case different from the line of cases that say inconsistent verdicts are okay, beginning with Dunn, followed by Powell, and then a number of circuit court cases thereafter. Do you have the exact language of the jury instruction in front of you? I do. Could you read to me which part of it? Sure. So with respect to count three, there were five elements that the district court instructed the jury on. The first element, that the defendant committed the crime charged in count two, aiding and abetting the murder of victim one. There was an equivalent on that count. So that's where the inquiry for the jury should have ended. It's different from the other cases of inconsistent verdicts, because in those cases, like Dunn, Powell, and their progeny, you had inconsistency between counts. Well, we have an inconsistency between counts in this case. However, count two carried over into count three. Those elements were subsumed. The elements of count two were subsumed into the first one. Why is that legally required? I mean, I understand the instruction that was given, but why is that necessary? In other words, I can construct in my mind differences between those two offenses, as I described. Why was it required that your client be found guilty of aiding and abetting a murder, to then be found guilty of aiding and abetting the use of a firearm during a crime of violence? Like, obviously, murder is a type of crime of violence, but crime of violence is a much broader category. So I hear what you're saying from what the papers say. Explain that as a sort of broader understanding. Well, I should have gone on with respect to the first element in count three, because it goes on to say, after you must finally be committed to count two, aiding and abetting murder is a crime of violence which may be prosecuted in the United States. So, again, the district court is referring the jury back to count two. Count two, then the elements of count two become the first element of count three. So we have a negative finding, and then we have a number of positives. But a negative times any number of positives always produces a negative result. And so this case is different from the other line of cases. And it's more like Randolph, this court's decision in Randolph, where we have a drug conspiracy. And when the jury was asked to find the type and the quantity of drugs involved in the conspiracy, the jury said none. This court recognized the exception, one of the exceptions, there are two to the rule of done, and said because it was internally inconsistent that the defendant should have been acquitted. And so I submit that this case is akin to Randolph. Did your client ask for this instruction? Did the government ask for this instruction? Was it an agreed to instruction, or do you know the history? I believe that all parties eventually, yeah, they all agreed to the instructions. Yes. I don't think that there were any objections. So these were the instructions that the parties in the court were satisfied with and the instructions that were given. And then the jury did with it what they did. So there's been some suggestion by the government that Mr. Young did not challenge the sufficiency of the evidence. But in my opening brief and in my reply brief, I point out that, yes, we are challenging the sufficiency of the evidence because a failure on any one of the elements results in a finding of insufficient evidence. So the question of the insufficiency of the evidence in support of the Rule 29 motion is squarely before the court. It's right for consideration. I anticipate that there will be an argument from the government that Mr. Young's motion for judgment of acquittal was untimely. That being the case, we would ask if the court were to so find that the case be remanded to the district court for it to make a finding whether or not it was a product of excusable neglect. But I don't think that we have to because I think the record is clear enough that the district court judge allowed Mr. Young's counsel to argue that motion and it made a ruling. So the fact that it made a ruling on the motion, I think it implicitly found that there was excusable neglect here. And in all fairness to Mr. Young's counsel, he was focused heavily on the issue of the acquitted conduct entering into the sentencing. And most of his resources and time and energy were spent on that issue, the McClinton issue, and it kind of took away his focus from where the issue really lies in the fact that there was insufficient evidence for the government's failure to establish the first element of count three. Your time has expired. I believe you have a rebuttal, so you'll have that reserved. Thank you. Good morning, Your Honors. May it please the court, Hillary Palm representing the United States of America. And I'm here today asking this court to affirm the convictions of Octavius Ferguson, Jordan Powell, and Markel Young for their convictions associated with a retaliatory gang shooting that occurred in Humboldt, Tennessee, that involved the 83rd Hoover Criminal Gang, an enterprise that was engaged in racketeering activities, and that they did so to maintain or to gain promotion within that enterprise. Can I say that that's an issue? Absolutely. We've got to reconcile the cases. Obviously, the government doesn't choose the jury pool, so sometimes there are a larger percentage of black members of the jury pool than others. But there are cases that seem to say that every, you know, that highlight the fact that every black juror was struck from a jury, which that would be more likely to happen when the jury pool has a smaller number of black members than not. So I'm just trying to reconcile how all these cases fit together. In this case, there were seven members of the jury pool that were black and four were struck. Is that right? The record is not clear in regards to how many jurors were in the box. And the way the district court handled the jury selection was that he was going to select 12 jurors and six alternates. And so he placed 18 seats inside the jury box. And so the council was only allowed to strike the members of the pool that entered the box. And there's some discussion. 18? 18 or 12? 18? Yes, 18. There was some discussion upon, I believe the court had called counsel to the bench in regards to the strike of juror 275 and 307. And there was some discussion about how many minority members of the jury pool were in the box. There was some discussion that there had been seven. I think there was some that there were five. And then at some point in time, defense counsel attempted to say that there were 11 or 12 actually in the pool. And the district court in the record said, I don't think that's exactly right. But there was never a clarification as to exactly how many people that were members of the venire that were actually minorities or African American jurors specifically. And the record is also not clear in regards to the number of African American jurors or minority members of the jury pool that were seated inside the box. There was some discussion about seven jurors and that the government had struck four of those. That accounts for the fact that juror number 129 was struck for cause and that was unobjected to by the defense. Juror number 231 was also struck for cause and that was objected to by the defense. Juror number 275 was seated. And then juror number 73, the defense used a peremptory challenge to strike juror number 73. So we know from the record that there are at least five African American jurors that were stricken from the actual jury. And in that case, the government used two peremptory challenges as to those five members. The record...  I'm sorry? Three were cause? Two were cause. 231 was for cause and that was objected to by the defense. So the court granted the government's motion for cause over the defense's objection. You said five were struck and two were peremptory? Yes. So three were for cause? No, the defense. Defense counsel struck juror 73. They used a peremptory challenge for juror number 73. So the end of that is that every black person who made it into the box was stricken though, right? No one wound up on the jury? The record is unclear as to how many African American juror people from the Vennari ended up on the jury. I have my own recollection, but that's not in the record. But it is clear from the record that those five jury members were African American and that was the way the court handled each one of those strikes. But I would point to that. So the court presumed for argument's sake, and I think we're doing so here today, that the defense met their prima facie case burden that the government was acting discriminatory in their use of the challenges. And I think we only take into consideration juror number 275 and 307 because those were the only two that are on the record that the government used preemptory challenges to and those are the only two that the defense objected to. So we then move to where the government has to provide a race neutral reason for their use of the preemptory challenges and then the district court weighs and determines whether there was purposeful discrimination. And this is a clear error standard and the deference is given to the trial court in regards to the credibility findings. And I know that counsel for Mr. Powell argues that the judge, sustaining the objection to 275, that this court should hold that against the government. But in fact, I would submit that the judges, the district court's weighing of the government's race neutral reasons, that goes to the district court actually weighing the race neutral reasons and determining whether or not there was a purposeful discrimination. He ceded 275 over the government's preemptory challenge. The government indicated to the court that the race neutral reason for the strike of 275 was her employment as well as her husband's employment and the court discounted those race neutral reasons and determined that she should be ceded. Juror number 307 is different. Juror number 307 stated five times in her questionnaire that she couldn't find somebody guilty and that was based off of her own personal experience with her brother's case. And I believe either in the questionnaire or at some point in time during her sidebar with the district court, she even stated that she didn't feel that she could sit in judgment of somebody. She didn't think that she could find someone guilty based off of her own personal reasons. Additionally, she expressed that she experienced anxiety when she entered the courtroom. She also mentioned that her emotional state that day entering the courtroom and she said it was hard for her to say someone could be guilty based off of what her family went through and that she felt that the criminal justice system was flawed because of, and she goes on to explain how a juror in her brother's case was, she didn't feel was paying attention. But for some reason it appeared that she also didn't feel comfortable being a person to decide guilt. And so how do you, what's your response to Ms. Basha's point about the rehabilitation efforts seemingly not being the same? In the comparative analysis between juror 204? Right. Yes. This also goes back I think to the district court judging the credibility and being there present with juror number 204 and juror number 307. Juror number 307 was very concerned about her ability to sit in judgment of somebody. Juror number 204 was generally biased I think to the government as a whole and there was some discussion about juror number 204 actually pointing to all of defense counsel, government's counsel and the judge himself and said I don't trust you, I don't trust you, I don't trust you, I don't trust you. But he elaborated in that he is just a generally untrusting person and if you give him a reason to trust you or give him evidence to weigh, he can weigh that evidence fairly and impartially and would not hold a bias. There's also a difference between juror number 204 and juror 307's reason for any bias. Juror number 307 had a very personal experience that clearly shook her to the core if she is experiencing anxiety 30 years after the incident where juror number 204 explained that his bias against the government was essentially presented to him by some type of national media which he described as general shenanigans by the government. That's different. He also explained that he didn't hold any bias for the rank and file of the government which would have been the witnesses that the government presented at trial. Those are two drastically different reasons for any type of bias. One being a personal experience that you hold with you 30 years later versus something that you've seen on the news. And at the end of the day, if my recollection is correct, juror number 204 said that he could be fair and impartial. Yes, yes. And the record is clear that the defense, one of the defendants at least, struck juror 204 for cause and the judge denied that, but he was ultimately seated as part of the jury pool. In regards to the, so we've talked about the comparative analysis of juror 204 and 307. The district court ultimately concluded that there was no discriminatory purpose in the government's strike as to 307 and she was properly seated and the government contends that the clear error standard, the deferential ruling in regards to that supports the district court's finding. If there are any other questions in regards to the Batson issue, I will turn to the sufficiency of the evidence issue that was raised by Mr. Ferguson. Could you turn to the inconsistent verdicts? Absolutely. We have more questions about that, I think. Absolutely. How do you reconcile these jury instructions? Yes. Yes. So the jury instructions that Mr. Nunnery cited to the court, it was just a piece of the jury instructions. The jury instructions in this case were fairly voluminous and the Vicar murder was referenced in at least, the Vicar murder was referenced in all counts. So the court discussed count one was conspiracy to commit Vicar murder and the court described the elements of Vicar murder in that conspiracy. Count two was aiding and abetting Vicar murder. The judge described the elements of count two in that jury instruction and then count three and count four were the 924C and 924J respectively in which the court also referenced count two. You have to take these jury instructions that were presented to the jury as a whole. The court described the elements in count two. He went through all of the findings that the jury needed to make in order to find the defendants guilty of count two and the reference in count three is really a reference to those elements that the court read in count two. It is supported by an additional jury instruction that the court also gave. The court told the jury that for each defendant and each charge you must consider whether the government has presented proof beyond a reasonable doubt and that a particular defendant is guilty of a particular charge. Your decision on any one charge against the defendant, whether it's guilty or not guilty, should not influence your decision on other charges against the defendant. And that's what this jury did. Which instruction is that? It's actually the pattern jury instruction. I think it's 203C, but it's found in the record, jury instruction record 409, page ID 2477. Pattern instruction, just generally. Specifically, the instruction for count three says that the defendant committed the crime charged in count two, aiding and abetting the murder of victim one and the fifth element of count two is that the defendant committed or aided and abetted murder as alleged in the indictment. And the defendant was acquitted of that charge. He was acquitted of count two, yes. And the first element of count three is that he committed count two. And that is a reference to the elements of count two. The jury wasn't – We know that he didn't commit those elements. I'm sorry. We know he didn't commit the elements from count two. The jury found him not guilty of count two. The jury found him guilty of count three. So they clearly went through the elements of count two, and in count three found that he aided and abetted the murder. That's where Powell and Dunn are controlling in this case because this is a predicate offense. You have to find one to find the other. This is very different than the cases cited by Mr. Young, specifically in regards to Randolph, where this is that Randolph is within the count. You can't have a drug conspiracy without drugs. In this particular case, the jury was told to independently weigh each count and the elements of each count of this indictment, and they independently weighed the elements of count three. I understand that, but it's not independent when you look at the actual instruction. The instruction says that the defendant committed the crime charged in count two. So that's – they're not – it's no longer – at least my understanding, it's no longer independent. It's expressly linking the two. I'm probably missing something. And maybe I'm not explaining our position. The jury was instructed as to the elements of count two, and it's my position that the specific instruction as to count three was really the district court referencing back the elements of count two without having to restate the elements of count two. And in that regard, the jury would have examined all of the elements of count two and came to an inconsistent verdict, where we are not to look beyond that veil of the jury's determination and assume that they made – they erred toward the defendant or erred toward the government, but to accept their verdict that they found the defendant guilty of count three. Just my last question. But in both counts, they had to assess whether the defendant committed – whether the defendant – in both counts, they had to decide whether the defendant aided or abetted the murder of victim one. Yes. Yes. One they said yes, and one they said no. That's correct. And you're saying that Randolph is a situation where the inconsistency is within one count, and here there's an inconsistency between two counts. That's correct. And that's how you distinguish Randolph. That is correct. And that's what places this case squarely within the purview of Powell and Dunn, where we say that inconsistent verdicts present a situation where the error in the sense that the jury has not followed the court's instructions, but most certainly it's unclear as to whose ox has been gored. Given the uncertainty of the fact that the government has precluded from challenging the acquittal, it's hardly allowable to allow the defendant to receive a new trial. The conviction is a matter of course. And that's the rationale in United States v. Powell. Is one idea it could be a compromise? They wanted to find him guilty of one count, and they decided this one over the other one? There could be lots of things. They could have been mistaken. They could have decided they wanted to be lenient. It could have been a compromise. There's lots of reasons for inconsistent verdicts. I hear you about the law you stated, but there is also a mutually exclusive?  And is it not mutually exclusive? If you've committed murder for the one, you've committed murder for the other. Or if you didn't commit murder for the one, you didn't commit murder for the other. And that's where I am saying that the mutually exclusive theory is supported by the Randolph decision, where that's an inconsistency within one count. And I looked at it as more of a sufficiency. Can you have, is it legally permissible to have a conspiracy without drugs? But it's also legally permissible for the jury for some reason of lenity, mistake, compromise, to find the defendant not guilty on one count, but guilty on the other count. Because they followed the court's instruction and they evaluated the elements of each offense independently of one another without considering their findings as to the other defendants and the other charges. So I have one follow-up question on this, because I just want to make sure that I'm understanding what you're saying here. I don't think that you're saying, but I want to make sure you're not saying, that as to count two, somehow the jury could have found that maybe the other two defendants did in fact violate count two and therefore were convicted of it, yet Mr. Young could be found guilty of count three irrespective of whether or not he's guilty of count two just because the others were? No, my point is that the jury could have found that he aided and abetted the murder and that he aided and abetted the 924C by evaluating the elements of count three, which included the elements of by-car murder. And just opted not to find him guilty of count two? Correct. That's my position, yes. So intertwined within the inconsistent verdicts argument is Mr. Young's sufficiency of the evidence argument as well. And unless the court would like for me to move on to the other sufficiency arguments, I can address that and then address the Powell and Ferguson sufficiency arguments. So the proof at trial was that Markell Young was essentially the leader of the Hoover criminal gang there in Humboldt, Tennessee, and that all of the members answered to him, that they had to get his permission to put in work, that they had to, and that was described as drug dealing, robberies, violence, maintaining their territory. There was also proof that Markell Young was seen earlier in the day prior to the homicide with the Kel-Tac firearm that was later identified as the gun that Monterio Ross carried. There was also proof that Markell Young promoted Ferguson and Powell there at the hospital after the homicide. And there was proof that Markell Young also disposed of the firearms by attempting to sell them as well as taking them to Memphis and trading them for additional firearms. And then finally, there was additional proof that Markell Young then later bragged about how the victim of the homicide, he referred to as Wee Wee or William Vincent, held a position of authority within the Gangster Disciple organization, and that was why he was targeted. So we have Mr. Young, while not actually present on scene pulling the trigger of this homicide, he gave the green light, he ordered it, and then he provided the firearms for the defendants that did actually appear on scene and commit the homicide of William Vincent. The sentencing court even noted at sentencing that there was sufficient evidence. The court was discussing how the burden of proof is different at sentencing versus at trial, but the court went on to say he would submit that there was even proof beyond a reasonable doubt that Markell Young committed the 924C. If there are any questions about Markell Young's sufficiency argument, I will move on to Powell and Ferguson's joint sufficiency argument, and if there is any time remaining, I will address their objections to the evidence that was submitted by the government. For argument's sake, I'm just going to address a de novo review in regards to the sufficiency of the evidence arguments. We submitted that those objections were not properly preserved in our brief, but we'll submit that upon briefs. For argument's sake, this court can affirm the judgments of Ferguson, Powell, and Young in regards to the sufficiency of the evidence because a rational juror could find that there was sufficient evidence to find these defendants guilty of these offenses. The main arguments that counsel made are the objection to interstate commerce, as well as the animating purpose, and I will walk through the interstate commerce first and then address the animating purpose. The 83rd Hoover criminal gang was an enterprise. There's no objection to the fact that the government proved that there was an enterprise. The question is, did they engage in racketeering activity that affected interstate commerce? Can I ask you on the interstate commerce component, is it your argument that so long as there's drug trafficking, we can just generally infer that that's typically an interstate activity, or do you agree that the government has to show actual evidence that there was, in this specific case, interstate activity? The interstate commerce component is a very de minimis. If the organization is engaged in an interstate commerce activity, and in this particular case, it is. I don't even think we have to go to that question because in this particular case, there was sufficient proof to show that there was drug trafficking activity by the enterprise, and that that drug trafficking was used to further the enterprise and its racketeering activities. Many of the objections by counsel here was that there was insufficient proof in regards to the testimony about the pot, the pot of money that the gang used to further the gang's criminal enterprise activities. In this particular case, there was testimony from Charias Ross that the members, actually Charias Ross and Dalen Ballard both, that members were expected to put in work. That this was a national organization, and that the little brother of Markel Young, Detrevion Moore, had actually traveled to Los Angeles to the land. There were pictures presented to the jury in which he was posing next to the 8300 block of Hoover Street in Los Angeles, California. There were Facebook messages. Markel Young sent a Facebook message that was presented to the jury in Exhibit 86, where he says to the group, we need to pull a move, got a big H call in Memphis, and the H call was explained to the jury as a meeting, a very private meeting of the enterprise, and that they shared their drugs. That there were multiple examples in Exhibit 86, where Markel Young would reach out to one member of the gang or vice versa, where he specifically said in one instance, you straight on some strong, you straight on half, and there was testimony by the agents at trial that described that strong was a strong strain of marijuana, and that a half would have been a half pound. There was another message, 3,400, I'll bring it to your door, elbow, and the agent described to the jury that that was $3,400 for a pound of marijuana. Additionally, the drugs were sourced from out of state. The drugs were sourced from California and from Washington State, then they were provided to Markel Young to distribute amongst the gang members from his cousin, that lived in those two states, and that was presented by testimony of Charis Ross, who literally drove Markel Young to the Western Union to wire the money across the country, to then receive the drugs via shipment. Further, the proceeds from those drugs furthered additional drug transactions. It provided bail money for the members of the gang. It provided commissary treats for members of the gang that were incarcerated. It helped buy firearms, and even in one instance, it was described by Charis Ross about how he witnessed Markel Young use that pot of money, or the pooling of those drug proceeds, to pay an individual $2,000 not to appear in court to testify against one of the other members of the gang. Further, there was testimony that the gang would rob as a source of their drug supply. I think there was some contradiction in regards to whether or not the pot was related to the robberies or to the drug trafficking, but it's my position that that was intertwined in regards to the proof. That there was proof that Markel Young sourced these drugs from out of state, as well as members of the organization would rob other local drug dealers of their drugs to then sell, and that the members of the gang would bring that back to pool with Markel Young to distribute, to provide for the gang in its need. Additionally, there was proof presented at trial, video evidence from the social media, in which the members of the gang were essentially bragging about how much money they made. This was to promote that territory, that reputation within the community. They were walking through a local mall, which goes hand-in-hand to Dalen Ballard's subjective belief that that may have been all that that drug money was used for, but he wasn't privy to the inner workings of the gang. He wasn't present during the H calls. But these members of the gang would walk through the local mall and present their gang signs, videoing themselves, talking about they do what they want, we're going to get rich. There was additional videos presented at Markel Young's mother's residence, in which the big homie from Memphis visited, talking about how they were going to get rich, they do what they want. All things that showed the power and reputation of the gang. In my very limited amount of time remaining, I'm going to move on to the promotion, because that also was very important. The court can reasonably infer, and the jury can reasonably infer, that when it's expected, when the members of the gang are expected to do these acts of violence, to do these crimes, to put in this work, that that motivating factor, that animating factor is to maintain their position within the gang and to get promoted. But in this particular case, we have Octavius Ferguson already being bragged on by the gang after the March of 2016 traffic stop where he was arrested with an obliterated serial number and had shell casings. Charius Ross testified about how the gang members laughed and joked about how ambitious he was. And so that's something that the gang members would want to have. Charius Ross also testified that the more work you put in, the higher you get in the gang, you get to be the OG. And at that point in time, that's the pinnacle of where you want to be in the gang. And for those reasons, it's the government's position that there was more than sufficient evidence to show that the animating factor was to be promoted within the gang. Thank you. I'm more confused about the record now than I was before we started. Is there anything that your friend on the other side said about sort of the Drupal composition and whatnot that you disagree with? I agree with the government that the record is fuzzy and that there are lots of numbers that are thrown around. The one that I keep coming back to is that out of five members of the veneer who are not stricken for cause, the government struck four. And on the record, the government doesn't dispute those numbers. As much as I think we would all just like to ask Ms. Parr and what she remembers about the jury selection. I think there's things about the demographics that both parties agree on. The first is that this was a remarkably homogenous jury pool. And again, I know Judge Radler, you were asking whether or not that's the government's fault. It's not, but it's something that the district court should have taken into consideration. Everyone agrees that the record shows that at most one black person made it onto the jury. And everyone agrees that the government struck multiple black people, whether for cause or via preemptory challenges. And so I want to take a step back from the specific numbers and point out that it's the government's pattern, whether it's fault four or five or something less than that, plus these other indications that we have. So plus the unequivocal rehabilitation of juror number 307 by the district court, plus the comparison that we can then make between her rehabilitation and the same rehab of juror 204, in addition to the district court's earlier finding that the government had discriminated with respect to juror number 275. And that discriminatory intent doesn't just disappear. I have about 10 seconds, so I'm just going to point out to the court what juror number 307 said on the record. She said that she could, she repeatedly affirmed that she could be impartial, that it would be unjust to favor one side or the other, and that she could set aside her anxiety. And these statements all led the district court to deny the government's challenge for cause. And that fact in and of itself makes their explanation implausible, pretextual. And if I may just finish. You do have a short day today. I'm sorry. I think we understand your arguments. Thank you very much. Briefly, Your Honor, in response to the government, I'd like to point out that a picture taken in California does not establish a national connection with the Crips gang. And as to the outsourced weed, that was from Mr. Ross's testimony, that he would drive, as a non-member of the gang, Mr. Young to pick up this weed, and then they would sell it together. Again, this was never related back to the Hoover Street gang as an entity. I think with my limited time, I'd like to give this court an analogy that as a member or an attorney of the Federal Public Defender Office, if I engage in writing a will for a family member and somebody else in my office does the same, that does not make me a member of the gang. It does not make our activities a will writing, an activity computed to the Federal Public Defender Office. So here, Mr. Ferguson's individual drug dealing with a non-member of the gang does not make that an activity, racketeering activity associated with the Hoover Street gang, just based on his mere status within the Hoover Street gang. If there are no questions, I'll see the rest of my time on rebuttal. Thank you. In response to your remark, Judge Radler, I don't think you're missing anything. I think you see the issue for what it is. This court recognized two exceptions to the rule against looking behind inconsistent verdicts in the Randolph case. One is where you have the situation of mutually exclusive verdicts. Mutually exclusive verdicts arise where you have a finding of guilt on one, which then negates a finding of guilt on another count. This is almost like the opposite. Here we have a finding of not guilty on one count, which in turn then negates a finding of guilty on count three. So it's a little bit different, and that's what makes this case like Randolph, because it's internally inconsistent. With count two carrying over into count three, becoming elements of count three. So that's where this case is like Randolph. That's what makes it different from Don Powell and the other cases. Why does this rule always benefit the defendant? In other words, maybe the jury was wrong about two. Maybe their client was actually guilty of both, but they decided to not throw the book at him and only convict him of one count. We don't know that, but we do know that in order to find them guilty of count three, they had to find them guilty of count two, and they didn't. So that right there negates consideration of the remaining elements of the offense. Had the court not incorporated count two into the instructions for count three, the elements of count three, this would be a different conversation. Might not be a conversation at all, as a matter of fact. But it did what it did, and that's what we're left with. That's what we have to grapple with. That's the issue that you guys have to decide, and I think that it is outside the heartland of the inconsistent verdict cases represented by Don and Powell, and it is very much like this court's prior decision in Randolph, and I think that's where the focus needs to be. The fact that this was an internally inconsistent verdict by virtue of the way the jury was instructed. Thank you, counsel. I see you're a CJA appointment. Thank you for handling the case. You did an excellent job, and also the other defense counsel and the government counsel, we appreciated your arguments as well. We'll take the case under submission, and the clerk may call the next case.